UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                                        )
SECURITIES AND EXCHANGE COMMISSION,)
          Plaintiff,                    )
                                        )
     v.                                 )    C.A. No. 09-100 S
                                        )
LOCKE CAPITAL MANAGEMENT, INC.          )
and LEILA C. JENKINS,                   )
          Defendants.                   )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Before the Court are cross-motions for summary judgment by Plaintiff Securities and Exchange Commission ("Commission" or "SEC") and Defendant Leila Jenkins. In this peculiar case, the Commission alleges that Jenkins concocted a Swiss client, created the appearance that the client had entrusted over one billion dollars to her company, and violated various securities laws. For the reasons explained below, the Court denies Jenkins's motion for summary judgment and grants the Commission's motion for summary judgment.

I.   Background

     A.   Claims and Procedural Posture

     The Commission alleges that Jenkins violated federal securities laws by fabricating a massive Swiss banking client for her company, Locke Capital Management, Inc. ("Locke"), to

drum up business. Locke is an investment advisory firm of which Jenkins is the sole owner and CEO. The Commission asserts that Locke touted how much money the fictitious client had placed in its care in marketing materials. Locke also allegedly falsified numerous records and SEC filings to document the sham customer. Then, when asked to back up her claims about the phony client, Jenkins allegedly lied to investigators.

The Commission alleges that, in the course of taking these actions, Jenkins (i) engaged in a fraudulent scheme in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) engaged in fraud in violation of section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a); (iii) committed fraud in violation of section 206 of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1)-(2); (iv) made false statements in filings with the Commission in violation of section 207 of the Advisers Act, 15 U.S.C. § 80b-7; (v) made false statements in advertising materials in violation of section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-1(a)(5), 17 C.F.R. § 275.206(4)-1(a)(5); and (vi) falsified records in violation of section 204 of the Advisers Act, 15 U.S.C. § 80b-4.

On May 6, 2010, Jenkins, who is acting pro se, filed a motion fashioned as a "Motion to Dismiss." However, in that

motion, Jenkins asked the Court to find in her favor on the grounds that there are no "genuine issues about any material facts for the Court to consider as a matter of law." (Def.'s Mot. to Dismiss 2, ECF No. 45 (hereinafter Def.'s Mot.).) She proceeded to make factual assertions that she claimed prevent the Commission from proving its case against her, and included a number of factual exhibits. Accordingly, on June 29, 2010, the Court notified the parties that it would treat Jenkins's motion as one for summary judgment pursuant to Rule 12(d) of the Federal Rules of Civil Procedure.

The Commission's cross-motion is the flip side of Jenkins's: it contends the undisputed facts support a grant of judgment against Jenkins as a matter of law. Both motions hone in on the key question at the heart of the Commission's case: was there ever really a Swiss client?

B.   Facts

1.   Locke and the Purported Swiss Client

Except as noted, the following facts are undisputed. Jenkins is the founder and sole owner of Locke, an investment advisory firm with an office in Newport. (See Pl.'s Statement of Undisputed Facts in Support of Mot. for Sum. J. ¶¶ 1-2, ECF No. 61 (hereinafter "Pl.'s Facts").)

One criterion institutional investors consider when deciding whether to use an investment advisor is its assets

under management. For instance, some investors will only patronize firms that have a minimum threshold of assets under management. (See id. ¶¶ 6-7; Def.'s Statement Submitted in Resp. to Pl.'s Mot. for Summ. J.'s Statement of Disputed Facts ¶ 6, ECF No. 66 (hereinafter "Def.'s Disputed Facts").) According to the Commission, investors rely on commercial services that measure advisory firms' assets under management, as well as other performance data. Jenkins responds that some investors avoid commercial databases and prefer to do their own diligence to avoid bias. The Commission also indicates that institutional investors would be deeply troubled by false statements made about an adviser's assets under management, because it would call into doubt the adviser's integrity. Jenkins disputes this statement, but admits that it "may have accurate attributes." (Def.'s Disputed Facts ¶ 9R.)

According to the SEC, in 2008, Locke represented to several commercial services that the firm was managing more than $1 billion in assets. (Pl.'s Facts ¶ 14.) Locke made similar claims with respect to 2006 and 2007 in brochures sent to potential clients. (Id. ¶ 16.) On amendments to Locke's Form ADV — an annual filing submitted to the SEC pursuant to the Advisers Act — Locke listed its assets under management as follows: (i) $1,232,689,661 in April 2007; (ii) $1,306,692,872 in April 2008; and (iii) $1,278,392,478 in March 2009. Jenkins

signed each amendment under the penalties of perjury. (See id. ¶ 12.) While Jenkins disputes all of this, she provides no evidence to rebut it, and the Commission accurately quotes the filings.

Jenkins told her employees that a major portion of Locke's assets under management came from accounts she referred to as "SPB" or "Swiss Private Bank" accounts. (Id. ¶ 19.) Because the client insisted on absolute secrecy, Jenkins explained, only she could communicate with it. Thus, as Jenkins stated at her deposition, her staff would recommend trades, and then Jenkins would pass those trades along to the Swiss client. (Jenkins Dep. 32:13-34:9, ECF No. 67-6.) Jenkins claims not to remember using the term SPB.

During an examination in 2008, Jenkins told the Commission that the Swiss client was confidential and that she communicated all trading information to it personally, by telephone. (Pl.'s Facts ¶ 24.) The agency pressed Jenkins for the identity of the client and data to back up its dealings with Locke. Specifically, the Commission instructed Jenkins to have the custodian of the confidential client's securities accounts forward custodial statements to the Commission. Instead, Jenkins herself gave the Commission spreadsheets bearing the logo "Chase" and containing lists of securities. (See id. ¶¶ 27-30.) She also gave the Commission several of Locke's

computer files, which included spreadsheets titled "Portfolio Appraisal[s]" for the "SPB Accounts." (Id. ¶ 26.) Jenkins disagrees with some of these assertions and at other times says that she does not remember. But again, she offers no evidence to support a contrary version of events.

### 2. Disputed Facts Regarding the Purported Swiss Client

The Commission contends there never was a Swiss client. As proof, it offers the circumstantial evidence summarized below. Jenkins disputes that any of the evidence establishes that she concocted an investor. Where noted, Jenkins also submits evidence to rebut the Commission's allegations.

Jenkins now maintains that the confidential client was a company called AM AG, located at Dufourstrasse 107 in Zurich. (Jenkins Dep. 20:3-10, 24:19-25.) However, the Commission asserts that, during a telephone conversation between Commission staff and Jenkins on December 30, 2008, Jenkins admitted that she had never visited the Swiss client; she had never personally met any representative of the Swiss client; and she did not have phone records of her calls to the Swiss client because she used prepaid phone cards. (See Declaration of Naomi J. Sevilla, Esq. ¶ 6, ECF No. 58 (hereinafter "Sevilla Decl.").) Jenkins disputes that she made these admissions.

Swiss authorities cannot confirm the existence of the company. The Commission contacted the Swiss Financial Market Supervisory Authority ("FINMA"), but FINMA found no Swiss telephone number, corporate registration, or any other trace of a company named AM AG. Although Dufourstrasse 107 is a real address where businesses operate, FINMA found no record of any entity called AM AG using it. FINMA's investigation also turned up nothing on individuals with the names Jenkins provided. The phone number Jenkins gave for AM AG yielded a recorded message saying the subscriber was unavailable. (See Declaration of Tonia J. Tornatore, ECF No. 59, Ex. A.)

The reason the search has come up dry, Jenkins pleads, is that AM AG wants to evade regulation. Once the company caught wind of the Commission's inquiry, she asserts, it went to ground and destroyed clues that might lead to its discovery. To clear her name, she says, Jenkins took Locke's former COO Derrick Webster on a sleuthing trip to Zurich in January 2009. Webster wrote a memorandum chronicling their efforts. (See Def.'s Mot. Ex. J.) Webster and Jenkins visited Dufourstrasse 107, where Jenkins spoke with the landlord. While the landlord did not have any information about a company named AM AG, according to the memorandum, he stated it was common for companies to operate under multiple names. (Id. at 7-8.)

Jenkins and Webster also observed a street sign printed with the letters "AMAG" near Dufourstrasse 107. (<u>See</u> Def.'s Mot. Ex. I 4-6.) Webster's memorandum suggests this may be the last shred of evidence that AM AG existed. The Commission responds that "the street sign can be explained by the fact that AMAG Automobil und Motoren AG, a major Swiss automotive company, operates a car dealership and parking garage at Dufourstrasse 182."[1] (Pl.'s Statement of Disputed Facts in Opposition to Def.'s Mot. to Dismiss 11-12, ECF No. 51 (hereinafter "Pl.'s Disputed Facts").) The Commission provides phone book records confirming this fact. (Declaration of Frank C. Huntington ¶ 12, ECF No. 57 (hereinafter "Huntington Decl.").)

According to the Commission, Jenkins manufactured a body of records about AM AG to breathe life into the illusion. First, the Commission says, she cooked up custodial trading data. The Commission contacted JPMorgan Chase & Co. ("Chase") about AM AG, but Chase has no record of accounts for a company by that name located at Dufourstrasse 107 in Zurich. (<u>See</u> Pl.'s Facts ¶ 37.) Chase reviewed the statements with the "Chase" logo provided by Jenkins and noted that the documents are not in the format Chase uses for its account statements and custodial records. (Affidavit of JPMorgan Chase & Co. Representative, Andrew R.

---

[1] Jenkins does not argue that her client is AMAG Automobil und Motoren AG.

Kosloff ¶ 4, ECF No. 54.)  The Commission also extracted several files from Locke's computers containing the same "Chase" logo that appears on the charts Jenkins gave the Commission.  One, a pdf file titled "chasenewlogo," consisted only of the logo.  The second, a Microsoft Word document titled "chase in word doc" included two examples of the "Chase" logo.  Both files were created three days after the Commission requested verification of the Swiss client's trading data.

Jenkins offers several theories to explain the logo files. She says the files were saved to her computer while making the reconciliations at the Commission's request; she says that, according to an unnamed forensic expert, computers on which users have navigated to a company's website might contain images of the company's logo; and she says someone may have tampered with Locke's computers during a break-in.  Yet, the Newport police did not find evidence of forced entry at the premises and closed their file on the incident.  (See Affidavit of Detective Christopher Hayes, Newport, Rhode Island Police Department ¶¶ 3-5, ECF No. 55.)

Second, the Commission accuses Jenkins of creating a fake email address for AM AG.  In September 2008, Jenkins told the Commission that she set up a Microsoft Hotmail account in July 2008, named "subadvtrades," to track her communications with the Swiss client.  (See Pl.'s Facts ¶¶ 40-41; Declaration of Marie

Hagelstein, ECF No. 56, Ex. H.) However, records for the email account demonstrate that it was a ruse, the Commission says. Jenkins sometimes waited days or weeks before forwarding trade recommendations from her staff to the "subadvtrades" address. As an example, data from Locke's computers show that on August 8, 2008, Jenkins passed along trade recommendations from July 7, July 15, July 18, August 5, and August 7 all at once.

In addition, the pattern of logins to the account is suspicious, according to the Commission. Data collected from Microsoft show only four logins between July 1, 2008, the date Jenkins admittedly created the account, and August 31: August 13, August 19, August 20, and August 31. This means the alleged client did not log in at all on six days Jenkins sent trade recommendations: July 11, July 14, July 18, August 8, August 22, and August 29. Moreover, the internet protocol ("IP") address used to access the account on August 19 and August 20 is in New York, New York, and is the same IP address that was used on July 1 when Jenkins created the account. (Huntington Decl. Ex. 4.) The IP address associated with the August 13 login was in Providence, Rhode Island. (Id.)

Jenkins condemns the login data provided by Microsoft as "significantly incomplete." (Def.'s Mot. to Dismiss 14.) Microsoft's records must be off, she deduces, because "LOCKE emails produced for other purposes show activity from and to

10

this account while no action is recorded in [the] particular email account history" from Microsoft. (Id.) Jenkins has not, however, submitted any such "emails produced for other purposes" to the Court.

Third, the Commission alleges that Jenkins mimed fee transactions with AM AG by moving funds through several accounts under her control. She gave the Commission cash flow statements for 2007 and 2008 that list several payments from "SPB" into Locke's account at Wachovia. (See Huntington Decl. Ex. 16.) However, the payments originated from an account belonging to Locke's hedge fund. (See id. Exs. 17-18.) Not only does she fail to explain these mysterious "SPB" transactions, Jenkins now claims that payment from the Swiss client cannot be confirmed, because Locke was paid in unverifiable "soft dollar" payments. (Jenkins Dep. 138-40, 173)

Apart from these factual disputes, the backbone of Jenkins's defense is that the Commission has hamstrung her by suppressing exculpatory records and refusing to consider their contents. The Commission, Jenkins contends, now possesses the only copies of the custodial statements and backup data that confirm AM AG's trading history. Locke's copies were stolen during the break-in, Jenkins says, and the Commission has ignored her requests for the materials she produced to it during discovery. (See Def.'s Mot. 2, 15.) In particular, Jenkins

focuses on data that have supposedly been "verified" through a third-party software system called "Advent Axys." (See id. at 9.) She protests that the Commission has the information, but has refused to review it and will not turn it over to her. The Commission responds that it gave Jenkins access to anything she wanted to see in November 2009.

On October 8, 2010, the Court held a hearing on the parties' cross-motions. At the hearing, Jenkins reasserted these allegations. To ensure these documents were available to Jenkins, the Court ordered the Commission to either provide Jenkins with a complete set of the documents she previously had produced or allow Jenkins to view the documents at its office. See Oct. 15, 2010 Order 1-2; see also Fed. R. Civ. P. 56(d)(3) (stating that if a non-movant indicates that she cannot present material facts to justify her opposition to a summary-judgment motion, a court may "issue any other appropriate order"). Jenkins was also granted leave to file a supplemental memorandum if during the course of her document review she discovered evidence supporting her motion. See Oct. 15, 2010 Order 1-2. Thereafter, Jenkins and the Commission filed supplemental memoranda. Jenkins did not proffer any newly-found exonerative evidence.

II.  Legal Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A genuine issue of material fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009).  In considering each motion, the Court must view the facts in the light most flattering to the non-moving party, and draw all reasonable inferences in that party's favor. Dávila v. Corporación de Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).  "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist." Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 10 (1st Cir. 2007) (quoting Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir. 2005)).  Summary judgment cannot be defeated, however, "by relying on improbable inferences, conclusory allegations or rank speculation." Id.

III. Discussion

A.   Jenkins's Motion

The Court can dispose of many of Jenkins's arguments with little difficulty.  The majority of her factual assertions are either unsupported by competent evidence, immaterial to whether

she may be found liable for the asserted securities law violations, or both. She argues that:

(i) she was never properly served with process, yet Magistrate Judge Martin has already found to the contrary (see Memorandum and Order 7, ECF No. 37), and Jenkins provides no basis to reconsider that ruling, see United States v. Vigneau, 337 F.3d 62, 67 (1st Cir. 2003) (explaining that the law of the case doctrine "precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided" (quoting Field v. Mans, 157 F.3d 35, 40 (1st Cir. 1998)));

(ii) the Commission sent copies of pleadings in this case to financial institutions to destroy Jenkins's credit; but Jenkins provides no evidence that financial institutions received pleadings, which are public documents, from the Commission; this charge is also irrelevant to the claims against her;

(iii) the Commission refused to review certain documents produced by Jenkins; but even if true, this fact would not prevent liability for securities fraud if the Commission has sufficient evidence to prove its case; nor is the Court aware of any authority, cited by Jenkins or otherwise, that requires a plaintiff in a civil case to review all materials produced by the defendant;

(iv) the Commission received faulty data from untrustworthy former employees of Locke, as well as from her ex-husband and his lawyer, but the Commission does not rely on any of this information in seeking judgment against Jenkins;

(v) the Commission fabricated figures for Locke's assets under management; but Jenkins does not support the assertion with any evidence, and she does not identify the alleged fabrications;

(vi) Locke never lied in marketing materials about its compliance with the Global Investment Performance Standards (GIPS), because a third-party marketing firm circulated the marketing information; but the Commission does not seek summary judgment on grounds of misrepresentations about GIPS compliance; it is also clear that Jenkins, and not the marketing firm, distributed the marketing materials in question (see Jenkins Dep. 65:15-66:25, 87:22-88:6 & Exs. 5, 8, Ex. I to Pl.'s App. in Support of Sum. J., ECF No. 60); and

(vii) the Commission approved Locke's registration as an investment adviser in 1997 knowing that Locke was managing assets for the purported Swiss client; but this assertion contradicts her filings with the Commission, which show no assets under management for 1997-1999, and even if it were true, this would not absolve Jenkins of liability if the Commission proves she made up the client (see Sevilla Decl. Exs. 1-3).

The remaining factual assertions in Jenkins's motion are material to the issue of whether Jenkins lied to Locke's customers and the Commission about the Swiss client. As discussed above, they all support her vow that AM AG is real. She claims that (i) there is evidence of AM AG's existence; (ii) the SEC possesses trading data that detail Locke's work for AM AG; (iii) that data was stolen from Locke's office, so Jenkins no longer has copies of it; and (iv) the data from Microsoft regarding the "subadvtrades" account does not reflect all her correspondence with AM AG.

It is plain that none of these assertions, even if proven, would entitle Jenkins to judgment as a matter of law. The SEC has adduced substantial damning evidence suggesting she lied about AM AG and tried desperately to cover her tracks. Even if Jenkins could prove that additional trade verification data was stolen and present that data, provide additional emails to or from the "subadvtrades" account, and verify the information about the Dufourstrasse address in Zurich — and it is highly unlikely that she could do all this, for the reasons discussed below — this would not be enough to conclusively refute the Commission's allegations and entitle her to summary judgment. This conclusion is obvious in consideration of the Commission's extensive evidence of misconduct detailed above. Thus, Jenkins's motion must be denied.

B.  The Commission's Motion

As stated above, the Commission alleges that Jenkins violated federal securities laws by committing fraud, making false statements in filings and advertising materials, and falsifying records.  The lynchpin of its claim is the fake Swiss client — if the Commission can show that there is no genuine factual dispute with respect to Jenkins's fabrication of AM AG, the other elements of the violations are easily established.

In short, Jenkins has produced no competent or credible evidence refuting the Commission's motion.  Jenkins submitted reams of memoranda containing bald assertions and loosely-woven tales.  Generally, Jenkins's "disputed" facts fall into three categories: (1) bald assertions unsupported by competent or admissible evidence; (2) "facts" supported only by Jenkins's own declarations, which are uncorroborated and so incredible that no reasonable jury could believe their veracity; and (3) immaterial fact disputes — fact disputes that, even when viewed in the light most favorable to Jenkins, do not preclude summary judgment in favor of the Commission.

With respect to the "disputed" facts falling into the first category, the law is clear that Jenkins may not, in opposing the Commission's motion, "rest upon conclusory allegations, improbable inferences, and unsupported speculation."  Aponte-Rosario v. Acevedo-Vila, 617 F.3d 1, 12 (1st Cir. 2010) (quoting

_Vineberg v. Bissonnette_, 548 F.3d 50, 56 (1st Cir. 2008)); _see also_ _SEC v. Ficken_, 546 F.3d 45, 51 (1st Cir. 2008) (in granting summary judgment for Plaintiff SEC, the First Circuit noted that "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." (quoting _Medina-Munoz v. R.J. Reynolds Tobacco Co._, 896 F.2d 5, 8 (1st Cir. 1990))); _Ciampi v. Zuczek_, 598 F. Supp. 2d 257, 262 (D.R.I. 2009) ("If the evidence [adduced in opposition to the motion] is merely colorable, or is not significantly probative, summary judgment may be granted." (quoting _Cadle Co. v. Hayes_, 116 F.3d 957, 960 (1st Cir. 1997) (alteration in original))); Fed. R. Civ. P. 56(c)(1)(a) (requiring a party to cite materials in the record to support his assertion that a fact is genuinely disputed). Unless Jenkins can point to competent evidence supporting her colorable assertions, the factual disputes are not genuine. While her bald assertions are too numerous to repeat here, they include various stories explaining away the complete lack of competent evidence supporting the Swiss client's existence, including details of an unsuccessful trip to Switzerland to track down AM AG and speculation that Swiss authorities used a wrong spelling in its verification process.

Jenkins tries to support some of her bald assertions with incompetent evidence. For example, Jenkins submits purported correspondence with AM AG — an investment management agreement and a termination letter, both ostensibly signed by a "Pieter Hofmman," whom she claims is an AM AG executive.[2] (See ECF Nos. 65-16, 65-18.) The documents would be inadmissible pursuant to Fed. R. Evid. 901(a), rendering authentication a condition precedent to admission. In light of the volume of evidence evincing Jenkins's untruthfulness, these documents would not be admissible without corroboration of their authenticity by a source other than Jenkins herself. Jenkins has not provided any substantiation in her filings,[3] and thus these documents constitute incompetent evidence.

The second category of potential factual disputes consists of statements supported only by Jenkins's own declarations and deposition testimony. Her declarations and deposition testimony contain general statements that there was a Swiss client and she did not knowingly make false statements. (See generally

---

[2] Though the purported executive's surname is spelled "Hoffman" on the termination letter, Jenkins now maintains that his name is actually spelled "Hofmann."

[3] Derrick Webster, a former employee of Locke, states in his affidavit that Jenkins showed him (in connection with the 2008 SEC examination) the purported contract between Pieter Hofmann and Locke, but Webster asserts no personal knowledge of its authenticity. (Affidavit of Derrick Webster 6-7 (hereinafter "Webster Aff."), ECF No. 65-12.)

Declaration of Leila C. Jenkins, ECF No. 65-1; Affirmation of Leila C. Jenkins (hereinafter "Jenkins Aff."), ECF No. 67-1.) However, other than her own word, Jenkins has not provided a shred of competent evidence corroborating the existence of the Swiss client. There is no trace of payment from the purported Swiss client to Locke; no evidence that Locke had its assets under management; neither the Swiss authorities nor Chase have any record of AM AG; and there is no other evidence of the purported Swiss client's existence.[4]

Simply put, no reasonable jury could believe Jenkins's incredible account in light of the overwhelming evidence that she manufactured stories and records and in the absence of a single piece of evidence corroborating her account.[5] A non-moving party may not defeat summary judgment by simply alleging the impossible in a self-serving declaration or affidavit. See, e.g., United States v. U.S. Currency, $864,400.00, No. 09-1935, 2010 WL 5189543, at *2 (4th Cir. Dec. 10, 2010) (affirming grant

---

[4] Grasping at straws, Jenkins now asserts that maybe the Swiss client was not Swiss at all; maybe the client was actually registered in another country. Not surprisingly, she provides no evidence of AM AG's registration in any country.

[5] Jenkins argues that the declarations of Deborah Henderson and Henry Rudy and the affidavit of Derrick Webster corroborate her account. These attestations, however, are devoid of any personal knowledge of the Swiss client or even circumstantial evidence tending to support its existence. (See generally Declaration of Deborah Henderson, ECF No. 65-7; Declaration of Henry Rudy, ECF No. 65-8; Webster Aff.)

of summary judgment for government in forfeiture proceeding where no material fact dispute existed because defendant's self-serving declarations were "incredible, and lack[ed] any basis in evidence"); Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005) (holding there was no genuine issue of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to" plaintiff's version of events); Penny v. United Parcel Serv., 128 F.3d 408, 416 (6th Cir. 1997) (concluding that "the plaintiff could not survive summary judgment based on . . . inherently unreliable evidence").

Jenkins offers one exhibit worth brief discussion. She submits computer screenshots of Advent Axys, a program Locke ostensibly used to keep track of trades for the Swiss client. (See Ex. W5-1, ECF No. 65-17.) She says the data has been "verified" through a third-party software system. However, the Advent Axys evidence lends no help to Jenkins's defense. First, Jenkins has not put the evidence into any meaningful context for the Court. The screenshots consist only of a jumble of numbers, and Jenkins has not provided the affidavit or deposition of a qualified person attesting to their authenticity, explaining the nature of the program, and detailing how the screenshots prove the existence of the Swiss client. This evidence therefore is not sufficient to preclude judgment in the Commission's favor.

Second, even if it is true that other employees entered most of the Advent Axys data at Jenkins's direction (as Jenkins argues), the evidence suffers from the same infirmity as her other evidence: it originates from Jenkins herself, and she does not allege that the employees have independent, personal knowledge of the trade data. Without any corroboration of the client's existence, no reasonable jury could find that this inherently unreliable evidence tends to prove there is a Swiss client.

The only true factual dispute, then, is whether Jenkins admitted to Commission staff that she never met agents of the purported Swiss client. However, this dispute is not material. Presuming Jenkins did not make the admission, the Commission's case is still strong enough to warrant summary judgment in its favor.[6]

Finally, Jenkins's claim that the Commission is withholding material evidence proving the existence of AM AG falls flat. According to Jenkins, the Swiss client's custodial statements are the "critical missing data" that would exonerate her. (Jenkins Aff. 2.) She contends these documents were stolen from Locke's Newport office during the alleged break-in. (Id. 2-3.)

---

[6] Jenkins also reasserts her claim that she was not properly served with process. As previously noted, the law of the case doctrine precludes relitigation of the issue. See supra Part III.A (citing Vigneau, 337 F.3d at 67).

But as noted previously, the Court has taken pains to ensure that the Commission did not withhold documents from Jenkins. See supra p. 12; see also Oct. 15, 2010 Order. Commission staff attested that the Commission did not confiscate any original documents or computers belonging to Locke or Jenkins and, in response to the Court's October 15, 2010 Order, the Commission provided Jenkins with copies of all materials she had previously produced to the Commission, the materials produced by third parties that Jenkins specifically requested, and all materials produced by third parties in electronic format. (Second Supp. Decl. Huntington 9, ECF No. 78.) The Court is satisfied that the Commission is not withholding the custodial records.

In sum, there are no genuine issues of material fact precluding summary judgment for the Commission. Jenkins has generally failed to present competent, admissible evidence in opposition to the Commission's motion; and the competent evidence that Jenkins has presented, namely her own declarations, are so inherently unbelievable in light of the evidence proffered by the Commission that no reasonable jury could find it credible.

C.   Violations of Federal Securities Laws

The Commission alleges that Jenkins, as the President and sole owner of Locke, flouted a number of federal securities laws

in furtherance of a fraudulent scheme.  (<u>See</u> Compl. For Inj. And Other Relief ¶ 1-2, ECF No. 1.)  As established above, the undisputed facts reveal that Jenkins fabricated a massive Swiss client to create business among potential investors.  She then included the fictitious client and its fictitious assets in Locke's records, SEC filings, and marketing materials, thereby inflating Locke's apparent assets under management to the SEC and clients alike.

The Commission first alleges that Jenkins committed fraud in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).  Under Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act, it is unlawful to use a fraudulent device in connection with the sale of any security.  <u>See</u> 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 77q(a).  To establish a violation of Section 17(a) or Section 10(b), or Rule 10b-5, the Commission must establish that the defendant (1) made a material misrepresentation; (2) in connection with the purchase or sale of securities; (3) with scienter.  <u>SEC v. Gillespie</u>, 349 Fed. Appx. 129, 130 (9th Cir. 2009); <u>SEC v. George</u>, 426 F.3d 786, 792 (6th Cir. 2005).

The following facts are undisputed by competent, credible evidence.  Jenkins made material misrepresentations in Locke's

Form ADV for the years 2007, 2008, and 2009. "A misrepresentation is material if there is a substantial likelihood that the misrepresentation would affect the behavior of a reasonable investor," _Ficken_, 546 F.3d at 47, and it is undisputed that investors rely on assets under management in deciding to which investment advisor to entrust their funds. _See_ _SEC v. K.W Brown & Co._, 555 F. Supp. 2d 1275, 1309-10 (S.D. Fla. 2007) (concluding that misrepresentations about assets under management on Forms ADV are material). The only reasonable inference that can be drawn from the facts of this case is that the misrepresentations were made to induce real customers to place their assets under Locke's management for security trading, which sufficiently connects Jenkins's conduct to the sale of securities. _See_ _SEC v. Zandford_, 535 U.S. 813, 813-14 (2002) (holding that the "in connection with" requirement of Section 10(b) should be construed broadly); _see also_ _Pinter v. Dahl_, 486 U.S. 622, 643 (1988) (noting that the language "in the offer or sale of any securities" in Section 17(a) should be construed broadly to "encompass the entire selling process").

As for the scienter element, the only reasonable inference that can be drawn from the scheme is that Jenkins acted with scienter; as CEO and President of Locke, Jenkins must have known her representations were false. _See_ _Ficken_, 546 F.3d at 47 ("Scienter is an intention to deceive, manipulate, or defraud,"

which in the First Circuit requires "a showing of either conscious intent to defraud or a high degree of recklessness.") (internal quotation and citation omitted). Accordingly, the Commission has demonstrated that Jenkins's fraudulent acts constitute violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.

The undisputed facts easily establish that Jenkins also breached or aided and abetted in breaching the anti-fraud, bookkeeping, reporting, and advertising regulation provisions of the Advisers Act and the rules promulgated thereunder. See 15 U.S.C. §§ 80b-4, 80b-6(1),(2),(4), 80b-7; 17 C.F.R. § 275.206(4)-1(a)(5). Sections 206(1) and 206(2) of the Advisers Act make it unlawful for an investment adviser[7] to operate a fraud upon a client or prospective client. See 15 U.S.C. §§ 80b-6(1),(2). Facts establishing a violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act also support a violation of Sections 206(1) and 206(2) of the Advisers Act. SEC v. Haligiannis, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007). Jenkins therefore violated Sections 206(1) and 206(2) of the Advisers Act.

Under Section 207, it is unlawful to willfully make a material misrepresentation or to omit a material fact in a

---

[7] Jenkins, as the President and CEO of Locke, is an investment adviser within the meaning of section 202(a)(11) of the Advisers Act. See 15 U.S.C. § 80b-2(a)(11).

registration application or report filed with the SEC under Section 203. <u>See</u> 15 U.S.C. § 80b-7. Here, Jenkins aided and abetted Locke's violation of Section 207 by signing Forms ADV that contained material misrepresentations of Locke's assets under management.[8] The Commission accordingly has demonstrated that Jenkins violated Section 207 of the Advisers Act.

Section 206(4) of the Advisers Act and Rule 206(4)-1(a)(5) make it unlawful for an investment adviser to distribute advertising materials that contain untrue statements of material facts or are otherwise false or misleading. Section 204 of the Advisers Act and the rules promulgated thereunder require an investment adviser to keep true, accurate, and current books and records. Jenkins aided and abetted Locke in violation of these sections by distributing marketing materials and, during the Commission's 2008 examination, producing books and records containing material untrue statements about, <u>inter alia</u>, Locke's assets under management. The Commission therefore has met its burden with respect to Section 204, Rule 204-2(a), Section 206(4), and Rule 206(4)-1(a)(5).

---

[8] Aiding and abetting liability requires the Commission to show that (1) a primary securities law violation occurred by an independent violator; (2) the aider and abettor knowingly and substantially assisted the primary violator; and (3) the aider and abettor knew or was aware that her role was part of the improper activity. <u>SEC v. Slocum, Gordon & Co.</u>, 334 F. Supp. 2d 144, 184 (D.R.I. 2004). Jenkins's actions here plainly establish aiding and abetting liability.

Accordingly, the Court grants the Commission's motion for summary judgment on the six claims for relief set forth in the Complaint. In light of this, the Court next ventures to fashion the appropriate remedy.

IV. Remedies

As remedy for Jenkins's wrongs, the Commission seeks a permanent injunction, the disgorgement of ill-gotten gains with prejudgment interest, and the imposition of a civil monetary penalty.

A. Permanent Injunction

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(2), and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d), each provide that a court may issue a permanent injunction where future securities law violations are reasonably likely. See SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003); see also SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998). The facts, as proffered by the Commission and not refuted by Jenkins with competent and credible evidence, suggest strongly that a permanent injunction is appropriate. Over the course of years, Jenkins fabricated a major client, inflated Locke's assets under management in advertising materials, and then lied to the Commission to evade prosecution. Because the Court easily finds that it is reasonably likely Jenkins would continue violating

securities laws if not enjoined from doing so, the Commission's request for an order enjoining Jenkins from committing future violations is granted.

B. Damages

In connection with securities fraud, the Court has discretion to order disgorgement. SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004). Disgorgement serves both to ensure that the perpetuator of a fraud is not unjustly enriched by the fraudulent act and to deter potential violators. SEC v. First City Financial Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989). The Court may order disgorgement in an amount reflecting "a reasonable approximation of profits causally connected to the violation." Happ, 392 F.3d at 31 (quoting First City Financial Corp., Ltd., 890 F.2d at 1231); see also SEC v. Druffner, 517 F. Supp. 2d 502, 512 (D. Mass. 2007) (noting that disgorgement must be "causally connected to the violation but it need not be figured with exactitude") (internal quotation and citation omitted).

The Commission seeks disgorgement of $1,781,520, which reflects the amount Jenkins, as Locke's sole owner, collected in advisory fees from Locke's real clients between 2007 and 2009. Jenkins collected these fees, according to the Commission, by attracting customers with Locke's inflated assets under management and performance history, starting in late 2006. The

Commission also asks for prejudgment interest on disgorgement in the amount of $110,956, which is calculated by applying the tax-underpayment rate.  See 26 U.S.C. § 6621(a)(2); <u>SEC v. First Jersey Securities, Inc.</u>, 101 F.3d 1450, 1476 (2d Cir. 1996) (ordering prejudgment interest on disgorgement using the tax-underpayment rate).

After entering default judgment against Locke, this Court ordered disgorgement in the amount of $1,892,476, based on an affidavit from Commission staff indicating that the amount represented Locke's profits since perpetrating the fraud, plus prejudgment interest.  See <u>SEC v. Locke Capital Management</u>, <u>Inc.</u>, 726 F. Supp. 2d 105, 108 (D.R.I. 2010) (citing Huntington Decl. ¶ 4).  The Commission now seeks disgorgement against Jenkins based on similar evidence proffered by its staff.  (<u>See</u> <u>generally</u> Huntington Decl., ECF No. 41-2.)  The Court concludes that the $1,781,520, plus prejudgment interest, represents a reasonable approximation of those profits causally connected to Jenkins's fraudulent conduct.  Because Locke and Jenkins's violations are so closely intertwined, Jenkins will be held jointly and severally liable with Locke for disgorgement of $1,892,476.  <u>See</u> <u>First Jersey Securities</u>, 101 F.3d at 1475-76 ("[W]here a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the

violations . . . it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order."); see also SEC v. Platforms Wireless Intern. Corp., 617 F.3d 1072, 1098-99 (9th Cir. 2010) (noting that joint and several liability is appropriate "where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws").

In addition to disgorgement, Section 20(d) of the Securities Act, Section 21(d) of the Exchange Act, and Section 209(e) of the Advisers Act each provide for three tiers of sanctions, with greater penalties for more flagrant violations. See 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3); 15 U.S.C. §80b-9(e). All violations are subject to first-tier sanctions, see 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e); second-tier sanctions are permissible for violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," id.; and sanctions are ratcheted up to the third tier when the violations involved fraud and "resulted in substantial losses or created a significant risk of substantial losses to other persons." Id. Civil penalties serve a dual purpose: to punish the wrongdoer and to deter future violators. SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

The Commission asks for a third-tier penalty for Jenkins, or more specifically, the greater of $130,000 per violation or the gross pecuniary gain of $1,781,520. The Commission, however, does not detail how Jenkins's conduct caused substantial loss, or the risk thereof, to others. Rather, the Commission states only that Jenkins's egregious and fraudulent conduct substantially expanded Locke's business. The Commission therefore has failed to demonstrate that third-tier sanctions are appropriate. The facts do, however, lend themselves easily to second-tier sanctions. Jenkins's conduct plainly involved fraud and deceit — she cooked up the Swiss client, falsified records and SEC filings, and made misrepresentations to prospective clients in marketing materials.

A court has the discretion to impose, for each violation, a second-tier sanction on a natural person up to the greater of $65,000 or the gross pecuniary gain. See id.; 17 C.F.R. Pt. 201, Subpt. E, Tbl. III (providing inflation-adjusted penalties). Jenkins's gross pecuniary gain was $1,781,520, and she committed six violations. The plain language of the Acts suggests that the per-violation ceiling is the greater of the statutory maximum of $65,000 or Jenkins's pecuniary gain. But, where a defendant has violated a number of securities laws in carrying out a single scheme, as here, courts generally have imposed a single penalty. See, e.g., SEC v. Brown, 643 F. Supp.

2d 1088, 1093 (D. Minn. 2009) (imposing a single penalty where defendant violated three statutes during a single course of conduct); SEC v. Rabinovich & Associates, LP, No. 07 Civ. 10547(GEL), 2008 WL 4937360, at *6 (S.D.N.Y. 2008) (imposing a single penalty where defendant violated many securities laws arising from a single scheme). Moreover, in determining the appropriate civil penalty, courts consider the following non-exclusive factors: (1) whether the violation resulted in substantial loss or risk of loss to others; (2) the egregiousness of the conduct; (3) the defendant's scienter; (4) whether the conduct was aberrational or recurring; and (5) whether defendant's financial situation supports a reduction. Opulentica, 479 F. Supp. 2d at 331.

Jenkins's conduct spanned a number of years and reflects a great effort to piece together a fraudulent scheme, cover it up, and then continue to lie about it throughout this litigation. Such an elaborate scheme no doubt evinces Jenkins's conscious intent to defraud and supports findings of recurring and egregious behavior. The only factors weighing in Jenkins's favor, then, are the lack of evidence demonstrating substantial harm or the risk of substantial harm to others and what the Court understands to be Jenkins's tenuous financial situation. In light of all this, a penalty equal to the amount of Jenkins's pecuniary gain, or $1,781,520, is appropriate.

The Court also wishes to revisit the civil penalty levied upon Locke in the Court's July 21, 2010 Order and Opinion ("July 21, 2010 Order") entering default judgment. See SEC v. Locke Capital Management, Inc., 726 F. Supp. 2d 105, 108-09 (D.R.I. 2010). The July 21, 2010 Order fined Locke $5,677,428, or three times disgorgement plus prejudgment interest. Id. at 109-10. The statutory language arguably provides for such a result, stating that for a second-tier sanction,

> the amount of penalty for each such violation shall not exceed the greater of (i) [$65,000] for a natural person or [$325,000] for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation . . .

15 U.S.C. § 80b-9 (e)(2)(B); 17 C.F.R. Pt. 201, Subpt. E, Tbl. III (providing inflation-adjusted penalties); see also 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B). Because "for each such violation" modifies both statutory ceilings (which, for a second-tier sanction on other than a natural person, is $325,000 or the gross pecuniary gain), the plain language arguably permits the imposition of a penalty greater than the total gross pecuniary gain, where the gross pecuniary gain is attributable to multiple violations. For example, here, the Commission proved Jenkins flouted six securities laws in executing her fraudulent scheme. Each violation is reasonably related to her gross gain from the scheme, but the pecuniary gain is not unique to any one of the violations. However, the Court has not found

authority, and the Commission does not offer any, supporting a civil penalty under these Sections that exceeds the gross pecuniary gain accrued from the sum of violations. Upon reflection, the Court has determined that a more appropriate civil penalty for Locke, therefore, is $1,781,520, or the gross pecuniary gain attributable to all six violations.

V.   Conclusion

For the reasons stated herein, the Court DENIES Jenkins's motion for summary judgment and GRANTS the Commission's motion for summary judgment. By a separate Final Judgment, Jenkins will be enjoined from committing future securities violations; she will be held jointly and severally liable with Locke for disgorgement of $1,892,476; and she will be ordered to pay $1,781,520 in civil penalties. The Court also amends its July 21, 2010 Order in this matter to reflect a civil penalty of $1,781,520 against Locke.


IT IS SO ORDERED.


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  June 30, 2011